## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALPARI (US), LLC, on Behalf of Itself and All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>CITIGROUP, INC. and CITIBANK, N.A.,<br><br>        Defendants. | Case No. 17-cv-05269<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.      This is a class action brought to recover the damages that Plaintiff and a class of similarly situated participants in the foreign exchange ("FX") market suffered as a result of Defendants Citigroup, Inc. and Citibank, N.A.'s ("Citigroup") practice of reneging on orders that it matched and accepted through its own and third-party electronic trading platforms.  The allegations herein are based on information and belief, except as to Plaintiff's own actions.

2.      Citigroup is one of the largest currency dealers in the FX market and is a well-known "Liquidity Provider" or "Market Maker."  As a Liquidity Provider, it acts as both a buyer and seller of currencies through its own proprietary electronic trading platforms and through third-party electronic communications networks ("ECNs"), described below, by streaming prices to buy or sell a stated amount of a currency.

3.      Plaintiff and the Class members are among Citigroup's counterparties in these FX transactions.  Through Citi proprietary platforms and other third-party ECNs, Plaintiff and Class

members placed electronic market orders to trade a given volume of currency. A market order constitutes an offer to trade a given volume of currency at the best, immediately available market price.

4.     The matching and execution of electronic FX transactions is governed by sophisticated computer algorithms. The algorithms operate to match Plaintiff's and Class members' market orders (offers) with corresponding streaming prices from Market Makers, including Citigroup. When those algorithms receive Plaintiff's market orders and match them with Citigroup's streaming prices, *i.e.,* the best, immediately available market price for a given volume of currency, Plaintiff forfeits the ability to complete that order with another party or with Citigroup at a different price or amount. An agreement has been reached.

5.     Many times, however, Plaintiff and the Class members did not receive the matched and agreed-on contract price (*i.e.*, the best immediately available price). Instead of executing the trade as promised once it had been matched with an outstanding and still valid streaming price, Citigroup delayed the execution of matched trades and, when it determined during the delay that the trade would be unfavorable to its position or that it could extract a larger profit, it reneged on the agreed price and either cancelled Plaintiff's and Class members' orders or filled them at worse prices. This practice has been dubbed "Last Look," and Citigroup's Last Look practices caused significant damages to Plaintiff and the Class while unjustly enriching Citigroup.

6.     Throughout the Class Period, Citigroup has used Last Look to reject millions of trades that would have been otherwise executed but for Citigroup reneging on its matched orders. As a result, Citigroup breached those contracts. Alternatively, by promoting its prices as "executable" when they were not, Citigroup has unfairly deceived Plaintiff and the Class.

Citigroup's conduct caused injury to Plaintiff and the Class members and caused Citigroup to be unjustly enriched at their expense.[1]

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction under 28 U.S.C. §1332(d) because the Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one Class member is a citizen of a State different than Citigroup.

8.    This Court has personal jurisdiction over Citigroup.  Citigroup has: (1) transacted business in the United States, including in this District; (2) exchanged currency with Class members throughout the United States, including in this District; (3) substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of its unlawful scheme in the United States, including in this District.

9.    Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d).  Citigroup resided, transacted business, was found, and had agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

10.    Plaintiff Alpari (US), LLC ("Alpari") was a New York company headquartered at 14 Wall Street, New York, NY 10005 during times relevant to this complaint. Alpari was dissolved on September 18, 2015.

---

[1]    Except as alleged in this Complaint, neither Plaintiff nor other members of the public have access to the underlying facts relating to Citigroup's improper activities.  Rather, that information lies exclusively within the possession, custody, or control of Citigroup and other insiders, which prevents Plaintiff from further detailing Citigroup's misconduct.  Plaintiff believes further evidentiary support for its allegations will come to light after a reasonable opportunity for discovery.

11.     Upon information and belief, Plaintiff was subjected to Last Look and suffered damages as a result.

12.     Defendant Citigroup, Inc. is a Delaware corporation headquartered at 388 Greenwich Street, New York, New York 10013.  Defendant Citibank, N.A. is a federally-chartered national banking association headquartered at 388 Greenwich Street, New York, New York 10013 and is a wholly owned subsidiary of Defendant Citigroup, Inc.   Defendants Citigroup, Inc. and Citibank, N.A. are referenced collectively in this Complaint as "Citigroup." Defendant Citigroup, on its own behalf and through its control of its proprietary trading platforms, engaged in FX transactions with Plaintiff and the Class that are the subject matter of this lawsuit.

13.     Citigroup, as used in this Complaint, includes all of Citigroup's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

## FACT ALLEGATIONS

**Background on the FX Market**

14.     The FX market is where currencies are traded.  It is the largest and most actively traded financial market in the world.  According to the most recent BIS Triennial Central Bank Survey,[2] global trading in FX averaged $5.1 trillion per day in April 2016.[3]  United States trading in FX averaged $1.273 trillion per day in April 2016.[4]

---

[2]     The BIS Triennial Central Bank Survey describes itself as "the most comprehensive source of information on the size and structure of global foreign exchange (FX) and over-the-counter (OTC) derivatives markets."  Bank for International Settlements, *Triennial Central Bank Survey: Foreign exchange turnover in April 2016* (Sept. 2016), *available at* http://www.bis.org/publ/rpfx16fx.pdf (hereinafter BIS, Triennial Bank Survey 2016), at 3. Central banks, including the Federal Reserve Bank of New York, and other authorities in 52 jurisdictions participated in the survey, collecting data from 1,300 banks and other financial institutions throughout the world.  *Id.*

15.    The FX market revolves primarily around spot transactions.  A spot transaction involves the exchange of currencies between two counterparties on a value date that is usually within two bank business-days' time, which is typically how long it takes a currency trade to settle.  Spot transactions account for just under half of daily FX turnover in the United States, roughly $581 billion.[5]

16.    Forward transactions are another major component of the FX market.  In FX forwards – also called "outright forwards" – the exchange (settlement) of the currencies is delayed beyond the customary two bank business-days' time, often months into the future.  FX forwards trade just like FX spots; their market prices simply reflect the impact of differing interest rates over time.  Forward transactions account for approximately 17% of daily FX turnover in the United States, or roughly $219 billion.[6]

17.    Approximately 98% of FX trading occurs over the counter ("OTC"),[7] meaning that it does not occur on a centralized exchange.  FX trading is thus predominantly accomplished through bilateral contracts between two counterparties.

18.    According to the *EUROMONEY* FX Survey for 2016, Citigroup was the world's biggest foreign exchange bank by volume, with an overall market share of 12.91%.[8]

---

[3]    BIS Triennial Bank Survey 2016, at 3.

[4]    Federal Reserve Bank of New York, *The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2016* (2016), *available at* https://www.newyorkfed.org/medialibrary/media/markets/pdf/2016triennialreport.pdf (hereinafter Fed Triennial Bank Survey 2016), at 1.

[5]    Fed Triennial Bank Survey 2016, at 3.

[6]    Fed Triennial Bank Survey 2016, at 3.

[7]    BIS, Triennial Bank Survey 2016, at Table 1.

19.     In FX trading, large banks, like Citigroup, act as Liquidity Providers or Market Makers.  They represent the "sell side" and are typically "price makers."  Plaintiff and the Class represent the "buy side," which includes, but is not limited to, institutional investors, asset managers, corporations, hedge funds, and wealthy private investors.  They are typically "price takers." Almost all FX trading occurs with Liquidity Providers such as Citigroup.

20.     Market Makers quote prices for a given volume of a specific currency pair.  The price consists of both a "bid" and an "ask."[9]  The "bid" is the price at which the Market Maker is willing to buy a given volume of the base currency.  The "ask" is the price at which the Market Maker is willing to sell a given volume of the base currency.  A Market Maker is willing to either buy or sell.

21.     By way of example, a Market Maker might quote the following price for a given volume of Euros:

| Currency Pair | Bid | Ask |
|---|---|---|
| EUR/USD | 1.0588 | 1.0591 |

22.     In this example, the currency pair is Euros to U.S. dollars, reflected by EUR/USD. Euros are the base currency, *i.e.*, the currency the Market Maker is willing to buy or sell.  The U.S. dollar is the reference or quote currency, *i.e.*, the currency which is used for pricing.  Here, the Market Maker is willing to buy Euros from a customer at a price of $1.0588 per Euro.  The Market Maker is willing to sell Euros to a customer at a price of $1.0591 per Euro.

---

[8]     *All Change in the 2016 Euromoney FX Rankings*, EUROMONEY, https://www.euromoney.com/article/b12kp9ksqdg9gl/all-change-in-the-2016-euromoney-fx-rankings (last visited July 12, 2017).

[9]     The "ask" is also referred to as the "offer."

23.    The difference between the bid and ask is called the "bid-ask spread."  In the above example, the bid-ask spread is $0.0003, calculated as the difference between the price the Market Maker will sell Euros ($1.0591) and buy Euros ($1.0588).  The bid-ask spread is one way in which the Market Maker is compensated.

**Electronic Trading of FX**

24.    Traditionally, most FX was traded via voice (telephone) trading.  A customer would simply call one or more banks and request a quote for a given volume of currency.  The bank would offer the customer a spread on the currency.  If the customer accepted by buying or selling at the offered spread, the trade would be processed.  This process was known as a "request for quote" or "RFQ."

25.    Over the last 15 years or so, FX trading has moved from voice to electronic trading platforms.  Today, most FX trades occur electronically.

26.    There are two general types of platforms used to electronically trade FX.  The first type is known as a single-dealer platform.  A single-dealer platform, as its name suggests, is an electronic platform where liquidity is traditionally provided by a single dealer, *i.e.*, the operator of the platform.[10]  Citigroup's proprietary platform Velocity ("Velocity") is one of the most popular single-dealer platforms.  Most major banks have established single-dealer platforms on which their customers can trade.

27.    During the Class Period, Citigroup had a number of proprietary single-dealer platforms on which various different types of customers could trade.  In 2002, Citigroup

---

[10]    Today, many single-dealer platforms, such as Velocity, also allow their customers to access liquidity from outside sources.

launched CitiFX[11] and in 2009 introduced CitiFX Velocity.[12]  Between 2009 and 2012, Citigroup

changed CitiFX Velocity's name to Citi Velocity, which is the platform's current name.[13]

28.    Velocity has its own website (https://www.citivelocity.com).[14]  Citigroup bills

Velocity as providing "faster execution and a more stable trading environment."  GLOBAL

FINANCE listed Citigroup as the Best Foreign Exchange Provider in 2015, both globally and for

North America.  This profile praises Velocity's "live interbank quotations for the spot market,

forwards, swaps, algorithmic trading and FX options" and its "competitive prices in more than

130 currency pairs."[15]  An article announcing Velocity's launch in 2009 details how the platform

"offers both exchange-based and one-click streaming execution."[16]  A 2010 article publicizes

---

[11]    *Citi to Outsource E-Liquidity,* FX WEEK (Nov. 4, 2002), http://www.fxweek.com/fx-week/news/1535242/citi-outsource-liquidity [note that this is a subscription website].

[12]    Saima Farooqi, *Citi Launches CitiFX Velocity Platform,* FX WEEK (March 6, 2009), http://www.fxweek.com/fx-week/news/1546239/citi-launches-citifx-velocity-platform.

[13]    Citi Electronic Solutions, https://web.archive.org/web/20121014033005/http:/www.citifx.com/electronic-solutions/index.html (last visited July 12, 2017).

[14]    Citi Velocity, https://www.citivelocity.com/siteminderagent/forms/login.fcc?TYPE=33554433&REALMOID=064080cfc110d71001a93380fe4730ff21&GUID=&SMAUTHREASON=0&METHOD=GET&SMAGENTNAME=SMrrTnY9etD%2bI2o%2b9Yl2EbzTAp6yjjOmqnhF3ULOz33gb4w6%2f54G6doyVeSEYhca%2fEnOuO%2bKIOFRtGOBW6hRpV8CT0Bzbi8dRz&TARGET=-SM-%2findex%2ehtml# (last visited July 12, 2017).

[15]    Gordon Platt and Michael Shari, *The World's Best Foreign Exchange Providers 2015,* GLOBAL FINANCE (Jan. 9, 2015), https://www.gfmag.com/magazine/january-2015/worlds-best-foreign-exchange-providers-2015?page=3.

[16]    *Citi Launches FX E-Commerce Platform,* FINEXTRA (March 11, 2009), https://www.finextra.com/news/announcement.aspx?newsreview=view&pressreleaseid=26439.

Velocity's "one-click executable streams for spot, forward outrights and swaps."[17]   In 2012, Citigroup launched Citi Velocity 2.0, a new trading platform.  Velocity 2.0 offers "extremely fast execution speeds" and "access to liquidity in over 100 currencies."[18]

29.    During the class period, Citigroup also operated three other platforms—CitiFX Pro, CitiFX Tradestream and CitiFX Prime.  CitiFX Pro was introduced in 2007.  Geared towards "sophisticated individuals and smaller institutional traders," CitiFX Pro promised clients "access to the same level of data and trading technology as institutional traders." [19]  CitiFX Tradestream was launched during the second half of 2012.[20]  It aimed to give "mid-sized institutions access to aggregated liquidity from a selection of Liquidity Providers without the need to engage a prime broker or a third-party technology firm for price aggregation."[21]  CitiFX Prime, which served "over 100 clients globally," offered "access to the FX market either directly or via a variety of electronic dealing portals" and a "24-hour client service team."[22]

---

[17]    *Citi Adds Streaming NDFs to CitiFX Velocity,* PROFIT&LOSS (Nov. 29, 2010), http://www.profit-loss.com/articles/news/technology/citi-adds-streaming-ndfs-to-citifx-velocity. [note that this is a subscription website].

[18]    Citi Velocity Trading, https://www.citifx.com/electronic-solutions/citi-velocity-trading.html (last visited July 12, 2017).

[19]    *Citi and Saxo Bank to Launch CitiFX Pro for Private Client Access to World Class FX Trading,* PRNEWSWIRE (Nov. 20, 2007), http://www.prnewswire.com/news-releases/citi-and-saxo-bank-to-launch-citifx-pro-for-private-client-access-to-world-class-fx-trading-59873842.html.

[20]    INSTITUTIONAL FX SERVICES: THE BROKERS HANDBOOK, https://www.citifx.com/mediacoverage/IFXS+Brokers+Handbook+Citi+SS+13+highres.pdf (last visited July 12, 2017).

[21]    CifiFX Tradestream, https://web.archive.org/web/20140220054724/http:/www.citifx.com/electronic-solutions/citifx-tradestream.html (last visited July 12, 2017).

[22]    CitiFX Prime, https://web.archive.org/web/20141026075339/http:/www.citifx.com/electronic-solutions/citifx-prime.html (last visited July 12, 2017).

30.     The above described proprietary platforms are collectively referenced in this complaint as "Citi proprietary platforms."  Citigroup widely distributed marketing materials and advertising for these platforms to the general public through, among other channels, the internet, such that these platforms were available to persons who desired to enter into electronic FX transactions.

31.     The second type of electronic FX trading platform is a multi-dealer platform, commonly referred to as an ECN.  Some of the most popular ECNs used by the buy side are Hotspot FX, FXall, and Currenex.  These ECNs provide a user with access to multiple Liquidity Providers, including Citigroup.

32.     Citigroup's FX trading is conducted through three broad categories: (1) clients that trade directly on Citi proprietary platforms using Citigroup's graphical user interface ("GUI"); (2) clients that trade using an ECN (such as Hotspot FX, FXall, and Currenex) that provides access to multiple Liquidity Providers, including Citigroup; and (3) clients that trade directly with Citigroup using a financial information exchange application program interface ("FIX/API").

33.     Whether a single-dealer platform or another ECN, all electronic FX trading platforms work basically the same way.  They provide the end-user with price and quantity data for various currency pairs.  Depending on the platform and the user settings, that data can come from a single Liquidity Provider, such as Citigroup, multiple Liquidity Providers, or all participants sharing data on the platform.

34.     The following is a screenshot of the user interface for Velocity:



35. The following is a screenshot of the user interface for CitiFX Pro:



36.    To illustrate the similarity between the interfaces of different platforms, below is a screenshot for a leading multi-bank ECN, HotSpot FX:



37.    Subject to exceptions not relevant here, on Citi proprietary platforms, Citigroup alone would provide the data that appears.  On other ECNs, the data would come from various Liquidity Providers as well as other buy-side market participants.

38.    Liquidity Providers, such as Citigroup, set the market price for a given volume of particular currency pairs by streaming prices to buy or sell for a specified quantity (*e.g.*, $1 million, $5 million, or $10 million) of currency at a given moment at a particular price that is valid until it is cancelled.  Because the FX market is extremely active, these prices are quickly filled or withdrawn and replaced with new prices reflecting the new market price for that

currency pair.  As a result, these streaming prices are presented as a constantly updating stream of executable bid and ask prices for a currency pair.

39.     When trading on a single-dealer platform such as Velocity, end-users typically see only one bid and ask price at any given time – that of the current price of a single Liquidity Provider prepared to act as counterparty.  On a multi-dealer ECN, end-users see a stack of prices reflecting prices from various Liquidity Providers and other market participants sorted to show the best available prices on both the bid and ask side (referred to alternatively as a "price ladder" or "market depth").  For example:



40.     Another way that Liquidity Providers such as Citigroup offer to trade on electronic trading platforms is by responding to a buy-side market participant's request for quote ("RFQ") or request for stream ("RFS") on a specified quantity of currency.  The Liquidity Provider then responds to that request with a price for which it is willing to trade that takes into account the size of the order and the identity of the market participant placing the order, including any special relationship that the Liquidity Provider has with the market participant. Like streaming prices, the market participant has the option to place a trade at the quoted price until that quote is cancelled.

41.     The bid and ask prices that Liquidity Providers quote to a counterparty as a result of a request for quote, or request for stream, often differ from the executable bid and ask prices that Liquidity Providers stream to the market.

42.     All platforms clearly distinguish between executable streaming prices that result from a Market Maker's streaming price and prices that result from a request for quote or request for stream.  The former can change in milliseconds as they are filled, replaced, or cancelled.  The latter appear only as a result of a specific request from an end-user, which are usually valid for a set period of time.

43.     Buy-side market participants' electronic orders can be broadly grouped into one of two categories: (1) market orders, which execute at the prevailing market price; and (2) limit orders, which execute only if the prevailing market price is equal to or better than a specific price input by the end-user.

44.     When a buy-side market participant enters an order, sophisticated computer algorithms match that order to streaming prices within the electronic FX platform, including by Liquidity Providers.  For limit orders, the algorithms are supposed to match and execute an order only if there are executable streaming prices within the platform matching the desired limit price.  For market orders, the algorithms will match and execute an order to the streaming price representing the best available market price currently within the platform.

45.     For orders placed on a single-dealer platform, the matching and execution algorithms are programmed by the Liquidity Provider, which – in the case of Citi proprietary platforms – was Citigroup.  For orders placed on multi-dealer ECNs, the matching algorithms may be programmed by either the Liquidity Provider or the ECN, and the Liquidity Provider determines whether to accept or reject the trade, including whether and how to apply Last Look.

46.     One of the major benefits of trading electronically is the speed with which trades can be executed.  One second is an extraordinarily long time in the FX market.  Market activity

moves market prices in milliseconds.  The speed of execution is particularly important during times of market volatility, where the speed and magnitude of price movements are exacerbated.

47.    When a buy-side market participant enters an order, there is a delay between the time the order is entered by the buy-side market participant and when that order is received by the FX platform and matched with a corresponding streaming price, i.e. latency.  If the Liquidity Provider has set a new price for the FX transaction detailed in the client's order before that order is received by the matching engine, then the Liquidity Provider need not execute the FX transaction at the prior price.

48.    If, however, the buy-side market participant's order is based on a price that has not yet been withdrawn or replaced by the Liquidity Provider during the time it takes for the order to be received by the FX platform, then the matching engine's computer algorithms match that order with a corresponding price from a Liquidity Provider.  Once the order and still valid streaming price are matched, a contract is formed and neither can be withdrawn or matched with another order.

**Citigroup Uses Last Look Algorithms to Avoid Agreed Pricing**

49.    During most of the Class Period, many platforms, including Citi proprietary platforms, had technology enabling them to match and execute nearly 100% of all trades in under five milliseconds.[23]

50.    Citigroup understood the importance of fast execution of electronic trades. Market prices can vary significantly in a second.  Accordingly, Citigroup has the technology to

---

[23]    1,000 milliseconds equal one second.  Five milliseconds thus equal 1/200th of one second.

execute matched orders in a matter of milliseconds.  In the interdealer market, Citigroup quickly executes electronic trades with other large banks.

51.     However, when dealing with Plaintiff and the Class, Citigroup programmed an unnecessary delay of anywhere from several hundred milliseconds to several seconds into its execution algorithms.  This intentional delay has been dubbed the Last Look period.

52.     Citigroup's Last Look period occurred after the buy-side market participants' orders were received by the FX platform and matched with a corresponding outstanding Citigroup streaming price (i.e., a streaming price that Citigroup had not withdrawn or replaced prior to the match).  Once the customer's order was matched, the customer could not withdraw the order.

53.     In May 2003, Currenex, an emerging ECN at the time, attracted Liquidity Providers by agreeing to their demand to stream prices so long as they could reject trades based on those prices even after a match occurred.  Upon information and belief, Citigroup first used this intentional delay, its Last Look, on CitiFX at least as early as January 1, 2008, and on Velocity beginning with its launch in 2009.  On CitiFX, Velocity, and the rest of the Citi proprietary platforms, Citigroup further applied Last Look to all API/FIX and ECN trades, as well as a portion of those customers using Citigroup's GUI.

54.     When a customer entered a market order for a particular currency on Citi proprietary platforms that corresponded with Citigroup's streaming price, Citigroup's algorithms matched the customer's market order to Citigroup's price within several milliseconds.  Absent its Last Look, Citigroup would have executed the matched order in several more milliseconds.  Instead, Citigroup's algorithms delayed the execution for sometimes at least several hundred

milliseconds, during which time Citigroup used the information derived from the order (quantity, buy or sell, etc.) to its trading advantage.

55.     Citigroup programmed into its execution algorithms the unilateral ability to renege on a customer's order that Citigroup had already matched and accepted.

56.     When the mid-price at the time the counterparty executed the trade moved beyond a predetermined threshold by end of the hold period, Citigroup reneged on the trade.  When customers executed multiple trades during the hold period, Citigroup could renege on some, or all, of the multiple trades placed within the hold period.

57.     In some circumstances, Citigroup's use of Last Look would not only result in Citigroup reneging on otherwise matched and agreed trades, but also resulted in customers' trades being filled at a worse price because Citigroup would fill the orders at the price at the end of the hold time if – and only if – the prices moved in Citigroup's favor beyond a predetermined threshold.  For example, customers that traded "at market" through FIX/API would have their prices "adjusted" by Citigroup at the end of the hold period if the market moved in the customer's favor beyond a predetermined threshold.  Thus, the customer did not get the previously matched, "best available" market price.

58.     Citigroup also implemented Last Look on customer orders that were entered as "stop loss" or "stop limit" orders.  These orders are designed to limit an investor's loss in a position by allowing the customer to predetermine that a trade should be executed once the market price reaches a particular level.  The order remains on Citigroup's order book until the price is reached.  Except, Citigroup would apply a hold period, and the order would not be executed until the end of hold time (or otherwise adjusted or rejected depending on if other Last

Look protocols were applied). As a result, the order would be executed at a price that was less advantageous to the customer.

59.     By reneging on its prices when doing so was to its financial benefit, Citigroup significantly and artificially increased its FX trading profits at the expense of buy-side counterparties.

60.     Citigroup used the same Last Look practices on ostensibly independent, third-party ECNs.

61.     Prior to July 2016, Citigroup never disclosed to its customers that it was using Last Look to obtain favorable trading results against them, and its customers never consented to Last Look.

62.     Although buy-side market participants can (and do) execute trades directly with each other on ECNs, Liquidity Providers, such as Citigroup, still act as counterparties in most FX trades executed on ECNs.

63.     ECNs earn money by charging a fee based on the volume of currency exchanged through their platforms. Without the liquidity provided by Citigroup and other major dealers, there would be significantly less flow of FX volume on ECN platforms, and, as a consequence, their business models would become unsustainable.

64.     As a condition of providing liquidity to ECNs open to buy-side market participants, Citigroup required ECNs to permit it to use Last Look when trading through those platforms. Granting such concessions to Liquidity Providers, such as Citigroup, was essential to any start-up ECN's economic survival: ECNs were hostage to Citigroup's demands. Because relatively few dealers are willing or able to act as Market Makers, ECNs had to attract major

Liquidity Providers such as Citigroup to their platforms in order to generate any appreciable FX volume.

65.    Thus, while the matching of orders on ECNs is controlled by the ECNs' algorithms, once any order is matched to Citigroup's streaming price, Citigroup's algorithms still delay execution of matched orders and determine whether the trade will execute at all.  This happens notwithstanding the fact that ECNs claim that the prices appearing on their platforms represent immediately executable offers to trade on the stated terms.  Leading ECN Hotspot FX, for example, advertised on its website that the benefits of trading on its platform "include full depth-of-book view, centralized price discovery, direct and anonymous market access, **_instantaneous trading on live, streaming prices_** and robust real-time pricing, benchmark, and reference data."[24]

66.    At least the following ECNs have granted or continue to grant Citigroup last-look privileges, including the ability to renege on matched orders: Currenex, FXall, and 360T.  These ECNs cater to clients all over the United States and the world.  Notably, when Liquidity Providers trade directly with each other on multi-dealer platforms such as Reuters Matching and EBS Market, they do not use Last Look.

**Examples of How Citigroup Used Last Look to Damage Buy-Side Market Participants**

67.    When a buy-side market order is matched to Citigroup's streaming price on either a Citi proprietary platform or an ECN, Citigroup knows that its price is the best available price at which that market order can execute and that while it is matched, the market order cannot match with any other order.

---

[24]    HotspotFX,
https://web.archive.org/web/20141116022446/http://www.kcghotspot.com/overview/index.jsp
(emphasis added) (last visited July 12, 2017).

68.     While delaying the execution of the matched order and preventing the order from proceeding with an alternative counterparty, Citigroup places a new streaming price that is slightly more profitable for Citigroup and withdraws the matched trade so that the buy-side order will match with Citigroup's price, thus giving itself the undisclosed ability to execute the trade at a more profitable price-point.

69.     The ECN market depth example below can provide an illustrative example.



70.     This ECN interface shows the market depth for the currency pair GBP/USD, sorted from highest to lowest price on the bid side (buy orders), and from lowest to highest on the ask side (sell orders).  A market participant wanting to buy one million GBP at the current

market price sees that the best offer to sell is $1.60388, which is less than the next-best price of $1.60393.  The market participant thus places a market order and should receive a price of $1.60388 because it would have matched with the corresponding streaming price.  However, if Citigroup streamed a price at $1.60388, Citigroup's Last Look protocols may renege on the trade at $1.60388 and place a new price for $1.60392.  With $1.60392 now reflecting the best price, and the buyer's order unable to match with another price while it was matched with Citigroup, the ECN's algorithm would then match the buyer's market order with Citigroup's higher price, and Citigroup's algorithms would again use their logic to decide whether to perform and realize the profit created by its breach or renege on this new agreement and repeat the cycle.

71.     Through this bait-and-switch – which takes place in milliseconds – Citigroup extracted additional profit at the expense of the unsuspecting buy-side market participant.  The buy-side participant would only see the final terms of the trade and would assume that the sell price at $1.60388 was either withdrawn or filled by another trade in the milliseconds before their market order was placed and matched with a corresponding Citigroup price, i.e., that the price was taken or changed during the latency period before Citigroup received the client order.

72.     Significantly, if a buy-side market order was matched to the order of another buy-side market participant on an ECN, the platform's algorithms would execute the matched trade immediately (in a matter of a few milliseconds).  And because trading on ECNs is typically anonymous to buy-side participants, a buy-side participant would not know whether its counterparty was a Liquidity Provider such as Citigroup, whether its order had been last-looked, or whether its order had been rejected and subsequently executed at a less favorable price.

**Citigroup Systematically Used Last Look to Injure Plaintiff and Other Buy-Side Market Participants**

73.    Every day, Citigroup is a party to thousands of electronic spot and forward FX transactions daily worth hundreds of billions of dollars in notional value.

74.    Citigroup's misrepresentations, omissions of material facts, acts of concealment, and failures to disclose were knowing and intentional and were done for the purpose of deceiving Plaintiff and Class members and obtaining their monies for Citigroup's gain.

75.    To the limited extent that the buy-side community was aware that something called "last look" existed, its benign name obscured its nefarious purpose.  Where Last Look was ostensibly directed at preventing technology issues, such as latency, from putting currency dealers at a disadvantage, Citigroup and others used its functionality to turn the tables and put those same traders at a disadvantage.

76.    Citigroup's actual use of Last Look, including its excessive hold times, also placed it in a position to exploit the information it gleaned from customers' orders to trade on Citigroup's own account with a significant advantage.  While Plaintiff and Class members are not yet in a position to confirm that Citigroup necessarily did so with any frequency, the profits it could have earned by doing so are such that Citigroup was at least aware of the possibility.

77.    Citigroup nevertheless rejected hundreds of matched electronic FX trades every business day from 2003 to 2015 using Last Look.  During the Class Period, Citigroup rejected tens of thousands of matched electronic FX trades using Last Look on Citi proprietary platforms and on various ECNs.  These rejected trades have injured thousands of unsuspecting buy-side market participants such as Plaintiff and Class members by causing their orders to be executed at less favorable prices.  Simultaneously, Citigroup has used Last Look to generate millions of

dollars of profit that it would not have earned had it allowed matched electronic FX trades to execute as intended and as Class members expected.

78.     As noted in a July 2014 article titled "*FX Focus – Look Back in Anger*" – published in leading industry publication, FX WEEK – the use of Last Look to reject matched trades is difficult to prove with currently available information because what goes on inside electronic trading platforms is largely opaque to buy-side market participants.[25] But the article also described how one senior trader at a buy-side bank was able to find "compelling evidence" of Liquidity Providers' abuse of Last Look:

> Such behaviour is hard to prove, but a senior e-FX trader at a large, London-based bank believes he has found compelling evidence of it, after completing some research for a client. "We put together a chart on the response times and order fill ratios of the 12 banks this client traded with. They were all big banks – essentially the top dozen liquidity providers in the market," he says.
>
> The trader found that, of the 12 banks, four had average response times of less than 100ms and order fill rates of 88–98%. A further four had average response times of 250–350ms and an average fill rate of around 75%. "That's quite a significant increase in latency when you consider all these pricing engines are co-located. There should be very minimal differences in latency between the top providers," he says.
>
> The trader's suspicions of last look being abused were heightened by the data from the final four banks, which had an average latency of 450–550ms and fill rates of 50–65%. "That basically means those dealers are using last look to throw away every single trade they don't like. That is not about latency protection – it's about unfair liquidity provision."
>
> While 500ms might not sound a long delay to the average person, the FX market has numerous price updates every second of every trading day. "If you think about it in terms of a hundred metres race, the difference between 25ms latency and 500ms latency is the

---

[25]     Michael Watt, *FX Focus – Look Back in Anger,* FX WEEK (July 11, 2014), http://www.fxweek.com/fx-week/analysis/2354192/fx-focus-look-back-in-anger.

difference between being first and being five or 10 metres behind the guy who comes first.  Half a second is an eternity in this market," he says.

\*        \*        \*

The heads of e-FX trading at three other global dealer banks also say they have noticed such behaviour.  All three wished to remain anonymous and declined to point the finger at specific firms, but one indicated that at least 60% of his sell-side competitors engaged in the practice.  Several other major banks either declined to comment on this topic or were unable to provide a response by press time.

79.     Similar evidence is not available to Plaintiff because it does not have access to the detailed trade logs that would show whether and when Plaintiff's market orders were matched to Citigroup's streaming prices; whether Citigroup last-looked Plaintiff's orders, and if so, for how long; whether Citigroup rejected Plaintiff's orders via Last Look, and if so, whether those rejections caused Plaintiff's orders to be filled at less favorable prices.

80.     Likewise, Plaintiff does not have access to Citigroup's algorithms that were used to initiate the Last-Look delay on Plaintiff's orders or that contained the logic by which these algorithms rejected Plaintiff's and other buy-side market participants' orders.  This information can only be obtained through discovery.

81.     Nevertheless, because Plaintiff routinely executed spot FX trades with Citigroup both on Citi proprietary platforms and on third-party ECNs, and because Citigroup routinely used Last Look with respect to the matched orders of buy-side users, it is inconceivable that Citigroup did not reject at least one of Plaintiff's matched orders using Last Look.

82.     Plaintiff and the other Class members were directly and proximately injured by Citigroup's use of Last Look to renege on matched orders on electronic trading platforms. Citigroup rejected matched trades that would have been favorable to Plaintiff and the Class and detrimental to Citigroup.  As a consequence, matched buy-side orders were filled at a less

favorable market price.  Citigroup's and ECNs' electronic trading records will show the amount of damages Plaintiff and the Class members suffered as a result of Citigroup's use of Last Look, but Plaintiff expects that class-wide damages will be in the hundreds of millions of dollars.

**Citigroup Concealed that It Used Last Look to Renege on Otherwise Executable Orders**

83.    The statute of limitations relating to the claims for relief alleged herein have been tolled because of fraudulent concealment by reason of Citigroup's active and inherently self-concealing conduct.

84.    Plaintiff and members of the Class had no knowledge of Citigroup's unlawful and self-concealing manipulative and inequitable acts.  Reasonable due diligence could not have uncovered Citigroup's wrongdoing because: (1) Citigroup did not disclose that it was using Last Look on Citi proprietary platforms or other ECNs to favorably manipulate its trading position; (2) the trading process is opaque because all that market participants can see is the final product of the executed trade; and (3) the entire chain of events from order to confirmation of execution usually takes place in less than a second.  Nothing puts buy-side participants on notice that their orders were delayed or rejected through Last Look.

85.    For those trades that were not filled due to Citigroup's use of Last Look, Citigroup took additional steps to obfuscate its actions.  Although the news of a "last look" being used by major Liquidity Providers first surfaced several years ago, Liquidity Providers such as Citigroup publicly insisted that Last Look was a necessary by-product of providing FX liquidity on multiple FX platforms.  Because Liquidity Providers simultaneously place the same order on multiple different eFX platforms, they are ostensibly exposed to the risk of having that order executed on more than one platform – even if they intend to enter into only a single transaction on those terms.  Liquidity Providers thus claimed that Last Look was necessary to ensure that multiple trades were not executed on a single order.

86.     Even if that were a valid justification for applying Last Look, this explanation of Last Look proved to be both pretextual and highly misleading.  The explanation was pretextual because Liquidity Providers such as Citigroup have the technology to withdraw an order from an ECN in several milliseconds; they do not need several hundred times that long to determine whether their order has been filled on another platform.  The explanation was highly misleading because it suggested that Liquidity Providers only used Last Look to reject trades on orders that had already been filled elsewhere.  But in fact, Citigroup routinely reneged on its executable orders for reasons other than the order being filled on another platform.

87.     Upon information and belief, Citigroup first disclosed its use of Last Look in a non-misleading manner online only in July 2016.  In its July 2016 Electronic Execution Disclosure, Citigroup describes Last Look as a "price check."  It states that, "[i]f the market price for a Transaction is at a level beyond a counterparty-specific threshold applied by Citi's trade acceptance logic *after receipt of a client request to trade*, Citi will reject the trade request."[26] Citigroup discloses that its current use of Last Look is symmetrical, meaning that it rejects trades regardless of whether market movement is beyond a predetermined threshold in the customer's favor or Citigroup's favor, but it also discloses that Citigroup's use of Last Look is "dynamic" and "has evolved over time."[27]

88.     The abuse of Last Look only started garnering attention in the buy-side FX community – albeit very limited attention – in the summer of 2014.  A July 11, 2014 article in

---

[26]     *Citi Electronic Execution Disclosure* (July 2016), http://www.citigroup.com/citi/about/data/electronic_execution_disclosure.pdf (emphasis added)

[27]     *Citi Electronic Execution Disclosure* (July 2016), http://www.citigroup.com/citi/about/data/electronic_execution_disclosure.pdf

FX WEEK titled "Last look orders come under scrutiny" noted that "[m]arket-makers stand accused of using Last Look order types aggressively to dial up the profitability of their books, with some buy-side participants warning the practice deserves as much regulatory scrutiny as the allegations of benchmark manipulation."[28]

89.     An August 28, 2014 article in FX WEEK titled "Clients switch off dealers using aggressive last-look strategies" reported that due to the recent revelation of Defendants' abusive practices, "[b]uy-side clients have begun to switch off banks that use aggressive last-look strategies and deliberately increase reject ratios, as market awareness of the pitfalls of this type of ordering grows."  The article went on to note that "[s]ome buy-side participants believe the practice could result in as big a scandal as the allegations of benchmark fixing that have blighted the industry for many months," and that "[i]t is understood sell-side participants have made the Bank of England aware of the issue."[29]

90.     Plaintiff thus asserts the tolling of the applicable statute of limitations affecting the rights of the claims of relief asserted by Plaintiff.  Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

**Regulatory and Industry Investigations of Last Looks**

91.     On the eve of announcements by regulators around the world that they had reached settlements with numerous Liquidity Providers for their roles in the manipulation of benchmark rates such as the WM Reuters Closing Spot Rates, on November 11, 2014, FX WEEK published an article titled "'Last look' will prevent settlement with regulators, warns New

---

[28]     Michael Watt, *Last Look Orders Come Under Scrutiny,* FX WEEK (July 11, 2014), http://www.fxweek.com/fx-week/news/2354579/last-look-orders-come-under-scrutiny.

[29]     Michael Watt, *Clients Switch Off Dealers Using Aggressive Last-Look Strategies,* FX WEEK (Aug. 28, 2014), http://www.fxweek.com/fx-week/news/2362297/clients-switch-off-dealers-using-aggressive-last-look-strategies.

Change FX."   The article quoted sources claiming that United States regulators, including the Department of Justice ("DOJ"), were investigating Liquidity Providers' last-look practices – though those investigations were "currently at an early stage."[30]

92.    A December 11, 2014 BLOOMBERG article for the first time revealed that "New York regulators have found evidence that Barclays Plc and Deutsche Bank AG may have used algorithms on their trading platforms to manipulate foreign-exchange rates, a person with knowledge of the investigation said."   According to an anonymous source familiar with the investigation, "[t]he algorithms were embedded in Barclays's BARX trading platform and Deutsche Bank's Autobahn system."[31]   On February 12, 2015, BLOOMBERG reported that the New York Department of Financial Services had "ordered Barclays Plc and Deutsche Bank AG last year to hire monitors to examine their foreign-exchange operations," and by the end of 2014, "Barclays had its monitor in place, and Deutsche Bank was in the process of installing one."[32]

93.    A Reuters article published on February 10, 2015 indicated that Credit Suisse, Goldman Sachs, Société Générale, and BNP Paribas have also been served with subpoenas issued by the New York regulators.   The article goes on to note the following:

> The banks started to produce information in response in late January and have met with officials handling the investigation, the sources said.

---

[30]    Eva Szalay, *'Last Look' Will Prevent Settlement with Regulators, Warns New Change FX,* FX WEEK (Nov. 11, 2014), http://www.fxweek.com/fx-week/news/2380698/last-look-will-prevent-settlement-with-regulators-warns-new-change-fx.

[31]    Greg Farrell, *Lawsky Said to Probe Barclays, Deutsche Bank FX Algorithm,* BLOOMBERG (Dec. 11, 2014), http://www.bloomberg.com/news/articles/2014-12-10/ny-regulator-said-to-probe-deutsche-bank-barclays-fx-algorithms.

[32]    Greg Farrell, *Banks' Ability to Delay Currency Trades May Not Be Fair,* BLOOMBERG (Feb. 12, 2015), http://www.bloomberg.com/news/articles/2015-02-13/lawsky-says-he-s-probing-banks-last-look-option-on-fx-trades.

> At issue is a latency period between the time an offer is floated and accepted, and whether the banks are gaming their clients during that time, the people said.  At least one bank claims the pause in the programs is designed to protect it from high-frequency traders, one source said.
>
> But others familiar with the practice say the time lag is a way for banks to manipulate the rates so they favor them.
>
> Transcripts of traders in online chat rooms that led to the settlements in November show them working together to move rates.
>
> There also are transcripts in which they discuss the manipulation of algorithms, one source said.[33]

94.    On or around March 3, 2015, it was reported that the DOJ and the Securities and Exchange Commission asked Barclays for information relating to BARX and its Last Look practices.  On November 18, 2015, Barclays entered into a Consent Order with the New York State and Department of Financial Services.  Barclays admitted it used Last Look in the manner described herein, agreed to pay a $150 million civil monetary penalty, agreed to terminate a Managing Director and Global Head of Electronic Fixed Income, Currencies, and Commodities ("eFICC") Automated Flow Trading, and agreed to an independent monitor.

## CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following persons:

> All persons in the United States who, between January 1, 2008 and June 30, 2016 (the "Class Period"), placed an order either on a Citi proprietary platform or a third party ECN that (1) was matched to Citigroup's streaming price; (2) was rejected by Citigroup; and

---

[33]    Karen Freifeld, *NY Financial Regulator Subpoenas Banks in Forex Probes,* REUTERS (Feb. 10, 2015), http://www.reuters.com/article/2015/02/10/usa-banks-probes-idUSL4N0VK61V20150210.

(3) was subsequently filled at a price less favorable than the original Citigroup price to which it was matched.

Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf.

Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

96.    The Class is readily ascertainable and is one for which records should exist, including, specifically, Citigroup's records and transaction data.

97.    Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands of geographically dispersed Class members, the exact number and their identities being known to Citigroup and the ECNs to which it streamed prices.

98.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class sustained damages arising out of Citigroup's common course of conduct in violation of the laws alleged herein.  The damages and injuries of each member of the Class were directly caused by Citigroup's wrongful conduct.

99.    There are questions of law and fact common to the Class, including, but not limited to, the following:

A.  whether Citigroup programmed its eFX execution algorithms to reject executable orders via Last Look;

B.  whether Plaintiff and Class members' orders constituted offers;

C.  whether Class members' orders that were matched to Citigroup's streaming prices constituted acceptance of Plaintiff's and Class members' outstanding offers;

D.  whether Citigroup's use of Last Look to reject matched orders on eFX platforms constituted breaches of contract;

E.  whether Citigroup was unjustly enriched as a result of its use of Last Look; and

F.   the appropriate Class-wide measures of damages.

100.   Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class, and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and FX-related litigation to represent themselves and the Classes.

101.   Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

102.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Citigroup and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Contract on Citi Proprietary Platforms**

103.   Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

104.   Plaintiff's and Class members' orders for currency trades placed on Citi proprietary platforms to be executed at the best available market price constituted offers by Plaintiff or the Class that Citigroup could accept through performance.

105.    Citigroup did, in fact, accept Plaintiff's and the Class's offers when Citigroup's computer algorithms matched Plaintiff's and the Class's offers with complementary Citigroup streaming prices.  Once matched, Plaintiff and the Class members could no longer withdraw their orders, and those matched orders became binding agreements to trade at the volume and price matched.

106.    Each time Citigroup failed to honor Plaintiff's and Class members' matched and accepted trade orders by using Last Look, Citigroup breached its contract with Plaintiff and Class members.

107.    Plaintiff and Class members were directly and proximately damaged by Citigroup's breaches of contract because following Citigroup's rejection of the matched trades via Last Look, Plaintiff's and Class members' market orders were filled at less favorable prices.

## SECOND CLAIM FOR RELIEF
### Breach of Contract on Other ECNs

108.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

109.    Plaintiff's and Class members' orders for currency trades to be executed at the best available market price placed on third-party ECNs constituted offers that Citigroup could accept through performance.

110.    Citigroup did, in fact, accept Plaintiff's and the Class members' offers when the ECN's computer algorithms matched Plaintiff's and the Class members' offers with complementary Citigroup streaming prices.  Once matched, Plaintiff and the Class members could no longer withdraw their orders, and those matched orders became binding agreements to trade at the volume and price matched.

111.    Each time Citigroup failed to honor Plaintiff's and Class members' matched trade orders by using Last Look, Citigroup breached its contract with Plaintiff and Class members.

112.    Plaintiff and Class members were directly and proximately damaged by Citigroup's breaches of contract because following Citigroup's rejection of the matched trades via Last Look, Plaintiff's and Class members' market orders were filled at less favorable prices.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment

113.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

114.    By using Last Look to reject matched orders on Citi proprietary platforms and ECNs in order to increase Citigroup's FX profits at the expense of Plaintiff and Class members, Citigroup knowingly engaged in conduct that was unfair, unconscionable, and oppressive.

115.    By using Last Look to reject matched orders on Citi proprietary platforms and ECNs, Citigroup received direct and specific benefits conferred by Plaintiff and Class members, including Citigroup knowingly receiving and wrongfully retaining excess profits that rightfully belonged to Plaintiff and Class members.  In so doing, Citigroup acted with conscious disregard for the rights of Plaintiff and Class members.

116.    By rejecting matched orders that should have been executed, Citigroup has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class members.

117.    Citigroup's unjust enrichment is traceable to, and resulted directly and proximately from, its wrongful use of Last Look.

118.    Under the common law doctrine of unjust enrichment, it is inequitable for Citigroup to be permitted to retain the benefits it received, and is still receiving, from its

wrongful use of Last Look.  Citigroup's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

119.    The financial benefits derived by Citigroup rightfully belong to Plaintiff and Class members.  Citigroup should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all wrongful or inequitable proceeds received by them.  A constructive trust from which plaintiff and all Class members may obtain restitution should be imposed upon all wrongful or inequitable sums received by Citigroup traceable to Plaintiff and Class members.

## REQUESTED RELIEF

120.    Plaintiff requests relief as follows:

A.  That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.  That the Court enter an order declaring that Citigroup's actions, as set forth in this Complaint, violate the law;

C.  That the Court award Plaintiff and Class members damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.  That the Court issue appropriate injunctive and other equitable relief against Defendants;

E.  That the Court award Plaintiff pre- and post-judgment interest;

F.  That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

G.  That the Court award such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

121.    Plaintiff demands a jury trial of all issues so triable.

Dated:  July 12, 2017

s/ George A. Zelcs

George A. Zelcs
Robert E. Litan
Randall P. Ewing, Jr.
KOREIN TILLERY LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile:  (312) 641-9751

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
Steven M. Berezney (SB-1978)
Michael E. Klenov
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile:  (314) 241-3525

Christopher M. Burke (CB-3648)
Walter W. Noss (WN-0529)
Kate Lv
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508

David R. Scott
Kristen M. Anderson
Peter A. Barile III (PB-3354)
Sylvia Sokol
Thomas K. Boardman
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334

Michael D. Hausfeld
Reena A. Gambhir
Timothy S. Kearns
Jeannine M. Kenney
HAUSFELD, LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201

Bonny E. Sweeney
Michael P. Lehmann
HAUSFELD, LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile:  (415) 358-4980